IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JEROME STALEY,**<br><br>　　　　　　　*Plaintiff,*<br><br>　　v.<br><br>**AAMCO TRANSMISSIONS, LLC,**<br>**JAMES GREGORY, AND**<br>**KIMBERLY ROBINSON,**<br><br>　　　　　　*Defendants.* | |

**COMPLAINT WITH JURY DEMAND**

## NATURE OF ACTION

1.　Plaintiff Jerome Staley brings this civil-rights action under the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended, to hold AAMCO Transmissions, LLC, its chief executive James Gregory, and its former director of franchise development Kimberly Robinson accountable for racial discrimination and retaliation against Mr. Staley as a Black corporate employee and franchisee applicant.

## PARTIES

2.　Plaintiff Jerome Staley is a resident of Delaware County, Pennsylvania. He is Black.

3.　Defendant AAMCO Transmissions, LLC (AAMCO), is a Pennsylvania limited liability company that is the franchisor of AAMCO auto-repair centers in the United States. At all relevant times, Defendant AAMCO's principal place of business has been in Montgomery County, Pennsylvania.

4.     Defendant James Gregory is and was at all relevant times the CEO of AAMCO. He works at AAMCO's headquarters. He is white.

5.     Defendant Kim Robinson was at all relevant times the director of franchise development for AAMCO. She worked at AAMCO's headquarters. She is white.

### JURISDICTION & VENUE

6.     Jurisdiction is asserted under 28 U.S.C. § 1343(a)(4) because this action seeks to recover damages and secure equitable relief under an act of Congress providing for the protection of civil rights.

7.     The Court has personal jurisdiction over Defendants and venue is proper here under 28 U.S.C. § 1391(b)(1) because Defendant AAMCO resides in this judicial district.

### FACTUAL BACKGROUND

**Mr. Staley begins working at AAMCO and is quickly promoted due to his excellent performance.**

8.     In August 2018, AAMCO hired Mr. Staley as the regional manager for the southeast region. Mr. Staley excelled in his role. His performance metrics were outstanding.

9.     In August 2020, AAMCO promoted Mr. Staley to vice president of operations for the east region.

10.     Mr. Staley was the first Black executive employee at AAMCO. Eager to emphasize its new diversity in the months after the murder of George Floyd, AAMCO featured Mr. Staley prominently in its marketing and promotional materials.

11.     Following Mr. Staley's promotion, AAMCO sent him to assist other vice presidents in their respective territories to improve their performance.

12.    Mr. Staley managed his territory expertly (and lent his assistance to his colleagues in theirs). Mr. Staley excelled in his role. His performance metrics were outstanding.

13.    But AAMCO did not compensate Mr. Staley as his white colleagues were compensated. Indeed, Mr. Staley was paid nearly $40,000 less in annual compensation than the other vice presidents (all of whom are white).

### Mr. Staley complains to AAMCO leadership about a $40,000 racial pay disparity at the vice-president level but is told "you make enough."

14.    In the summer of 2021, Mr. Staley learned about the racial pay disparity and complained to AAMCO leadership. He did so professionally and with the expectation that the unfair compensation would be remedied swiftly.

15.    First, in an email to chief operating officer Zach Peters, Mr. Staley complained about disparate treatment in compensation compared to his white counterparts. Mr. Peters ignored the email.

16.    When Mr. Staley did not receive a response to his race-discrimination complaint to Mr. Peters for several weeks, Mr. Staley forwarded that email to chief executive officer Defendant James Gregory.

17.    Mr. Staley was hesitant to raise his concerns with either Mr. Peters or Mr. Gregory given race-biased statements he had heard them make at work. Mr. Peters had criticized an Indian franchisee saying he was trying to run his store "like a 7-Eleven" (referring to what Mr. Peters perceived as an abundance of South Asians who own 7-Eleven franchises). And Mr. Gregory had said openly that AAMCO's industry was only for "Italians and Jews," and Mr. Staley was neither. But despite his

reticence given their past displays of casual racial animus, Mr. Staley had a firm conviction that race discrimination has no place in American business and summoned the courage to oppose the racial pay disparity. Mr. Gregory, however, did not share that same conviction.

18.   Mr. Gregory told Mr. Staley that he was "disappointed" in Mr. Staley for complaining of race discrimination and responded to Mr. Staley's complaint by saying: "you make enough."

19.   Instead of taking Mr. Staley's complaint seriously and remedying the racial pay disparity, AAMCO allowed the race discrimination in compensation to persist. AAMCO did not investigate Mr. Staley's complaint. Mr. Gregory simply decided that Mr. Staley should not be paid what his white colleagues were paid to perform comparable work, even as Mr. Staley *assisted* his peers in improving their performance in their respective territories.

### AAMCO begins its campaign of retaliation against Mr. Staley by denying his $11,000 bonus.

20.   Mr. Gregory expressed his disappointment in Mr. Staley's opposition to discrimination by denying him his third-quarter bonus.

21.   Mr. Staley's compensation included a bonus structure. For the third quarter of 2021, Mr. Staley ranked number one in the company based on his territory's performance. Mr. Staley earned $11,000 as a bonus, but he never received it.

22.   Mr. Staley asked AAMCO leadership multiple times about his bonus. AAMCO leadership said that they were withholding bonuses for this quarter because they did not think that Mr. Staley sufficiently trained his team. This excuse is flimsy. Before

Mr. Staley's promotion, his territory (the east region) consistently ranked last in sales. After only a few months at the helm, Mr. Staley's eastern divisions ranked first, second, and third in third-quarter sales of all the stores in the nation. Such tremendous turnaround performance is impossible without sufficient training.

23.     AAMCO's failure to pay Mr. Staley's earned bonus was in retaliation for his complaints to the COO and CEO about race discrimination in pay.

### Mr. Staley gives notice that he is leaving his position due to the racial pay disparity. Mr. Gregory tries to convince Mr. Staley to stay.

24.     Mr. Staley was unwilling to work for a company that denied him equal pay and retaliated against him for opposing the racial disparity in executive compensation. He submitted his 30-days' notice at the beginning of November 2021.

25.     Mr. Staley continued to perform his duties diligently through his notice period.

26.     As he was preparing to depart his role, Mr. Gregory attempted to convince Mr. Staley to stay. Mr. Staley again raised the racial pay disparity, explaining that he did not want to work for a corporation that paid him less than his white colleagues. Mr. Gregory refused to compensate Mr. Staley in a manner commensurate with his title and qualifications and equally with the white vice presidents. Mr. Gregory again expressed that he was "disappointed" that Mr. Staley raised the pay disparity and reiterated: "you make enough."

27.     Mr. Staley left his position at AAMCO at the end of November 2021.

**AAMCO continues to retaliate against Mr. Staley by denying his franchisee application.**

28.    Given his excellent performance in his corporate role and his comprehensive knowledge of the corporation gleaned from his time in the executive suite, Mr. Staley wanted to explore a franchise opportunity with AAMCO. He viewed a franchise role as a chance to leverage his operations expertise. Becoming a franchisee would free him from the constraints of corporate decision-makers limiting his compensation and artificially capping his opportunities for success.

29.    Mr. Staley had worked with Alfred and Angelia Garnett when he served as the regional manager for their store in Aiken, South Carolina. Mr. Staley and the Garnetts discussed and ultimately decided to enter into a partnership that would bring Mr. Staley into their company—GDIM Enterprises, Inc.—as a co-franchisee. This required AAMCO's approval.

30.    Given his knowledge of AAMCO's franchising practices, Mr. Staley fully expected his application to join the Garnetts in the franchise of the Aiken store would be approved without difficulty. Mr. Staley was aware that former AAMCO executives had been readily approved to become franchisees in the past. Mr. Staley knew this to be true even for former AAMCO executives who were *fired* from a corporate position. For example, Jim Kinkade was fired from AAMCO and approved to be a franchisee within a year of his termination.

31.    But when Mr. Staley applied to join the Garnetts' AAMCO franchise, AAMCO denied his application. Mr. Staley was floored by AAMCO's denial of his application. He immediately suspected the denial was in retaliation for his complaints to AAMCO

leadership about the racial pay disparity, just as his bonus had been denied him in retaliation for opposing discrimination.

32.     Mr. Staley and Mr. Garnett spoke with Defendant Kimberly Robinson, then the director of franchise development for AAMCO. When Mr. Staley asked her why his application was denied, she admitted it was "because of how you left." Her response confirmed Mr. Staley's suspicions that the denial of his franchise application was in retaliation for opposing discrimination.

33.     Mr. Staley left AAMCO professionally and with sufficient notice. He continued to excel in his role through his last day. He continued to perform so well that the CEO asked Mr. Staley to continue in his role. During that conversation, Mr. Staley again raised the racial pay disparity. But Mr. Gregory remained unwilling to relent: he wanted Mr. Staley to continue as an AAMCO executive but did not want to compensate him fairly in comparison to his white peers. "How he left" was complaining about race discrimination. There is no other explanation.

34.     Despite Ms. Robinson's admission about the discriminatory motive for the denial of his franchisee application, Mr. Staley continued to hope that AAMCO would relent. He continued to work with the Garnetts in the capacity of an employee and helped manage the store's operations. The Aiken store's performance metrics improved, and the shop was ranked impressively among franchisees nationwide.

### AAMCO expands its campaign of retaliation against Mr. Staley to the Garnetts and GDIM Enterprises, Inc.

35.     But AAMCO did not relent and its retaliation against Mr. Staley did not end at the denial of the franchise application.

36.     Mr. Staley continued to oppose race discrimination and retaliation for his complaints of pay disparity. He advised AAMCO that he retained counsel, that he was continuing to work with the Garnetts to manage the Aiken store, and still wished to be approved as a co-franchisee.

37.     In response, AAMCO targeted the Aiken store and the Garnetts for retaliation based on their association with Mr. Staley. AAMCO demanded that the Garnetts sell their franchise to a white corporate employee (Chad Whalls) for less than they had paid to purchase it in 2019. Mr. Whalls registered himself as the owner of the Aiken franchise and began receiving mail at the store. The Garnetts resisted the corporate pressure to sell. When they declined, AAMCO demanded immediate payment of $20,000 in unexplained "fees." Under threat of a lawsuit, the Garnetts complied.

38.     When AAMCO's efforts to drive the Garnetts from the system failed, it continued to retaliate against them and Mr. Staley through other means. Its campaign of retaliation included blocking Mr. Garnett's server access (so he could not send emails to corporate employees), designating the Aiken store a "target" store for increased scrutiny, artificially increasing the number of customer complaints at the store by altering its methodology for logging calls on minor issues (like the store's voicemail being full), and discontinuing its contractually required efforts to provide recruitment support to fulfill the store's staffing needs.

39.     For months, Mr. Staley continued to work at the Aiken store, which he and Mr. Garnett have had to personally staff. They filled the roles of technicians and customer service managers in the wake of AAMCO's refusal to providing the required

recruitment services for which the Garnetts pay AAMCO a "recruitment fee." The Aiken store has had to resort to obtaining staff through local placement agencies, paying a premium to secure staff that AAMCO is failing to recruit.

40.     The new regional manager of the southeast region recently visited the Aiken store and told employees they were underpaid, even though AAMCO has no say in franchise-employee compensation. This effort to interfere with the existing staff was further retaliation against Mr. Staley, who continued to participate in the operation of the store. AAMCO's efforts to drive the Garnetts from the AAMCO system in favor of a white corporate employee continue to this day.

### AAMCO knowingly facilitates white supremacy by permitting race discrimination in compensation and retaliating against those who oppose race discrimination.

41.     AAMCO does not treat current white corporate employees or former white corporate employees the way it has treated Mr. Staley.

42.     White employees are fairly paid while Mr. Staley—the only Black executive— was denied pay commensurate to his experience and performance.

43.     Former corporate employees who are white are approved to become AAMCO franchisees, including those fired for misconduct, while Mr. Staley was denied approval because of his opposition to race discrimination.

44.     AAMCO refused to give Mr. Staley the compensation or fair consideration of his franchisee application that it generally makes available to white people. The Garnetts, the only Black franchisees in the southeast region, saw Mr. Staley as the valuable, capable professional that he is and sought to bring him into their business. AAMCO has thwarted those efforts at every turn because of Mr. Gregory's admitted

"disappointment" in Mr. Staley's opposition to AAMCO's racial pay disparity in executive compensation.

45.    AAMCO then targeted the Garnetts by releasing an unrelenting, systematic campaign of retaliation, including harassment, intimidation, and breaches of contract, to punish the Garnetts for associating with someone who opposed race discrimination at AAMCO. These retaliation efforts harmed Mr. Staley and his intended business relationship with Garnetts.

46.    In August, Mr. Staley ceased his efforts to join the Garnetts in their Aiken franchise. AAMCO's unrelenting retaliation drove Mr. Staley from any further involvement with the corporation.

47.    Mr. Staley was injured and continues to be injured by AAMCO's race discrimination and retaliation.

### CLAIM 1:[1]
### CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981(B)
### RACE DISCRIMINATION IN COMPENSATION
### (AGAINST DEFENDANTS AAMCO AND GREGORY)

48.    Plaintiff incorporates all allegations of this complaint.

49.    As detailed above, AAMCO violated Mr. Staley's right to equal treatment in making and enforcing contracts, including enjoying all benefits, privileges, terms, and conditions of the contractual relationship under the Civil Rights Act of 1866, 42

---

[1] Mr. Staley has filed a charge of discrimination with the Equal Employment Opportunity Commission. He will request his right-to-sue letter after 180 days per 29 C.F.R. § 1601.28(a) and amend this complaint to allege additional claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and the Pennsylvania Human Relations Act, 43 Pa. C.S. § 955(a).

U.S.C. §§ 1981(a) and 1981(b), as amended in 1870, 1871, and 1991. AAMCO privileged white employees over Mr. Staley in compensation.

50.   Mr. Staley is Black. His experience in transmission work qualified him to be hired as an AAMCO regional manager. AAMCO quickly promoted Mr. Staley to become the vice president of operations in the east region. His qualifications and performance were exceptional.

51.   Mr. Staley's compensation was $100,000 in salary plus bonuses. Yet despite his exemplary performance—covering his own territory and assisting other vice presidents in their territories—Mr. Staley was earning $40,000 less in annual salary than his white counterparts.

52.   Mr. Staley was performing work substantially equal to or better than that of white vice presidents who were compensated at significantly higher rates than Mr. Staley despite his comparable, if not more relevant, work experience. A lack of work experience is not available to AAMCO as a legitimate, nondiscriminatory reason for the pay disparity. Mr. Staley's race was the but-for cause of his disparate compensation.

53.   Each day that Mr. Staley worked as a vice president of operations and experienced the disparate treatment, he was injured by AAMCO's custom of compensating white executives at a higher rate than Black executives. Had AAMCO ceased this wrongful practice when Mr. Staley complained about the racial pay disparity, at least some of Plaintiff's injuries could have been avoided.

54.     But for Mr. Staley's race, he would not have experienced the disparate compensation to which AAMCO subjected him.

55.     As a direct and proximate result of AAMCO's racial disparity in executive compensation, Plaintiff has suffered and continues to suffer economic and non-economic damages.

56.     AAMCO's acts were intentional, malicious, and demonstrate reckless indifference to Plaintiff's rights. He is entitled to recover punitive damages.

CLAIM 2:
CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981(B)
RETALIATION FOR OPPOSING RACE DISCRIMINATION
(AGAINST DEFENDANTS AAMCO AND GREGORY)

57.     Plaintiff incorporates all allegations of this complaint.

58.     As detailed above, when Mr. Staley complained about the racial disparity in executive compensation at AAMCO, the COO ignored him, and the CEO expressed that he was "disappointed" that Mr. Staley complained. He told Mr. Staley, "you make enough."

59.     Plaintiff's opposition to race discrimination by complaining of a racial pay disparity was in good faith and under reasonable belief that a § 1981 violation existed. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015); *Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017); *Lara v. Samuel Adams Pa. Brewing Co.*, LLC, No. 5:20-cv-0498, 2020 WL 5211206, at *23 (E.D. Pa. Sep. 1, 2020).

60.     After Mr. Staley opposed the pay inequity, AAMCO withheld his third-quarter bonus.

61.     But for Mr. Staley's opposition to race discrimination, he would not have been denied his third-quarter bonus.

62.     As a direct and proximate result of AAMCO's retaliation for his opposition to racial disparity in executive compensation, Plaintiff has suffered and continues to suffer economic and non-economic damages.

63.     AAMCO's acts were intentional, malicious, and demonstrate reckless indifference to Plaintiff's rights. He is entitled to recover punitive damages.

**CLAIM 3:**
**CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981(A)**
**RETALIATION FOR OPPOSING RACE DISCRIMINATION (POST-EMPLOYMENT)**
**(AGAINST DEFENDANTS AAMCO, GREGORY, AND ROBINSON)**

64.     Plaintiff incorporates all allegations of this complaint.

65.     As detailed above, Mr. Staley complained about race discrimination in executive pay and was retaliated against during his AAMCO employment because of his opposition to discrimination.

66.     AAMCO's retaliation against Mr. Staley continued after he left his employment with the company. AAMCO took adverse action against Mr. Staley when Ms. Robinson, then the director of franchise development, denied his application to become a co-franchisee of the Aiken store. On information and belief, that denial was approved by Mr. Gregory.

67.     AAMCO's adverse action against Mr. Staley is causally connected to Mr. Staley's statutorily protected activity because AAMCO leadership said so. On a call with Mr. Staley and Mr. Garnett, Ms. Robinson said that Mr. Staley's application was denied "because of how you left." Mr. Staley resigned from his position at AAMCO.

He was not terminated. He gave reasonable notice, worked throughout his notice period, and the CEO tried to convince him to stay. Yet, white employees who were fired from AAMCO were approved to become franchisees within one year of their termination. The only credible explanation for Mr. Staley's denial is the one that AAMCO, itself, gave: opposing race discrimination in compensation.

68.     But for Mr. Staley's opposition to race discrimination, he would not have experienced the retaliation to which AAMCO subjected him by denying his application to become a franchisee.

69.     But for Mr. Staley's opposition to race discrimination, he would not have experienced the retaliation to which AAMCO otherwise subjected him in his new employment, including the campaign of retaliation to damage the Aiken store and drive the Garnetts from the AAMCO system for associating with Mr. Staley.

70.     As a direct and proximate result of Mr. Staley's opposition to race discrimination, Plaintiff has suffered and continues to suffer economic and non-economic damages.

71.     AAMCO's acts were intentional, malicious, and demonstrate reckless indifference to Plaintiff's rights. He is entitled to recover punitive damages.

### PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

- Declare that Defendants' acts and conduct violate the Civil Rights Act of 1866;

- Enter judgment in Plaintiff's favor on all claims for relief;

- Award Plaintiff full compensatory damages, economic and non-economic, including, but not limited to, back pay, front pay, lost profits, and damages for pain, suffering, mental anguish, emotional distress, humiliation, and

inconvenience that he has suffered and is reasonably certain to suffer in the future in amounts to be determined at trial;

- Award Plaintiff equitable remedies including injunctive relief as appropriate;

- Award Plaintiff his reasonable attorneys' fees and all other costs of this suit under 42 U.S.C. § 1988;

- Award pre- and post-judgment interest at the highest lawful rate;

- Award all other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable, just, or proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues within this complaint.

Respectfully submitted,

*Devon M. Jacob*
s/Devon M. Jacob

| | |
|---|---|
| Devon M. Jacob | Ashlie Case Sletvold (*pro hac vice* to be filed) |
| **JACOB LITIGATION, INC.** | Jessica Savoie (*pro hac vice* to be filed) |
| P.O. Box 837 | **PEIFFER WOLF CARR KANE** |
| Mechanicsburg, PA 17055 | **CONWAY & WISE, LLP** |
| (717) 796-7733 | 6370 SOM Center Road, Suite 108 |
| djacob@jacoblitigation.com | Cleveland, OH 44139 |
| | (216) 260-0808 |
| | asletvold@peifferwolf.com |
| | jsavoie@peifferwolf.com |
| | |
| | *Counsel for Plaintiff Jerome Staley* |